IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ D.C.

05 SEP 30 PM 3:12

THOMAS M. GOULD
CLERK, US DISTRICT COURT
W/D OF TN, MEMPHIS

|   |   |   |
|---|---|---|
| RORY ALLEN GREGORY, | X | |
| Plaintiff, | X | |
| | X | |
| vs. | X | No. 04-2628-Ma/V |
| | X | |
| FEDERAL BUREAU OF PRISONS, et al., | X | |
| Defendants. | X | |

ORDER GRANTING PLAINTIFF'S MOTION FOR AN
EXTENSION OF TIME
ORDER GRANTING IRREGULAR MOTION
AND
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Rory Allen Gregory, Bureau of Prisons prisoner number 36628-079, an inmate at the Federal Correctional Institution in Memphis ("FCI-Memphis"), filed a pro se complaint pursuant to Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), on August 9, 2004. Plaintiff paid the civil filing fee on August 11, 2004. The complaint alleges that the defendants were deliberately indifferent to plaintiff's serious medical need for treatment of his urinary tract blockages, urinary tract infections, and kidney stones. The Court issued an order on October 28, 2004 that, inter alia, dismissed certain claims and parties pursuant to 42 U.S.C. § 1997e(a) and 28 U.S.C. §§ 1915A(b)(1) & (2) and authorized service on defendants Gary Aaron, Joyce Anderson, and Dr. Nahem A. Naimey on a

claim arising out of the purported cancellation of a May 1, 2003 order for a lithotripsy. Defendant Aaron is the former Associate Warden at FCI-Memphis, defendant Anderson is the Health Services Administrator at FCI-Memphis, and defendant Naimey is the Clinical Director at FCI-Memphis.

On February 14, 2005, defendants filed a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment. On May 2, 2005, defendants filed a supplement in support of their motion to dismiss that raised the defense of qualified immunity. Defendants filed another supplement on June 3, 2005 that cited additional authority in support of their qualified immunity defense.

On March 2, 2005, plaintiff filed a motion seeking to hold the defendants' motion in abeyance for sixty (60) days to permit him the opportunity for discovery. Although defendants did not oppose the plaintiff's request for an extension of time to respond to their motion, defendants filed a response in opposition to the plaintiff's motion to take discovery on March 17, 2005, and plaintiff filed a reply on March 23, 2005.[1] Although the Court did not issue an order

---

[1]     The Court's local rules do not contemplate the filing of reply briefs without leave of Court. See Local Rule 7.2(b). The plaintiff's reply was not accompanied by a motion seeking leave to file a reply, and the Clerk should not have filed it. Although the Court will exercise its discretion to consider the plaintiff's reply in this instance, the Clerk is ORDERED not to file any additional reply briefs submitted by either party to this action without leave of Court.

    Plaintiff's reply raises a number of additional issues that are not relevant to the motion for an extension of time, but which must, nonetheless, be briefly addressed. First, plaintiff asserts that defendants have mischaracterized his complaint as pertaining to the denial of the treatment prescribed on May 1, 2003. Plaintiff's Response to Defendant's [sic] Opposition to Motion for Discovery,
                                                                    (continued...)

2

specifically directed to plaintiff's motion, Magistrate Judge Diane K. Vescovo issued a scheduling order on March 29, 2005 that included a discovery deadline. The Court GRANTS plaintiff's motion for a sixty-day extension of time to respond to the motion filed on February 14, 2005.

On June 14, 2005, plaintiff filed a response to the February 14, 2005 motion to dismiss.[2] On July 25, 2005, plaintiff filed a motion seeking an extension of time to respond to the motion to dismiss or, in the alternative, for summary judgment. The Court issued an order granting that motion on July 28, 2005 and setting a

---

[1]    (...continued)
filed Mar. 23, 2005 ("P. 03/23/05 Reply Br."), at 2-4. The Court's previous order concluded that "the plaintiff has exhausted a claim about the cancellation or rescission of the treatment ordered by [Dr.] Shappley on May 1, 2003." 10/28/04 Order at 15. To the extent the plaintiff believes that that holding was unduly narrow, the proper course was to file a motion to reconsider the October 28, 2004 order. Although the plaintiff asserts that "Plaintiff's Administrative Remedies were fully exhausted on a wide range of deprivations, denials and delays concerning his claims set forth in his Complaint," P. 03/23/05 Reply Br. at 2, the documentation supporting that assertion was not submitted with the complaint or described with particularity in the text of the complaint. Although the plaintiff has submitted additional documentation about his efforts to exhaust his administrative remedies, those matters cannot be considered in this lawsuit. The October 28, 2004 order stated that "§ 1997e(a) requires the prisoner to exhaust his administrative remedies prior to filing suit and, therefore, he cannot exhaust those remedies during the pendency of the action." Id. at 13 (citing Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999)). Accordingly, the defendants' description of the scope of the remaining claims is accurate.

[2]    Because the Court has granted the March 2, 2005 motion for an extension of time, the plaintiff's response to the defendants' February 14, 2005 motion was timely.

3

due date of August 12, 2005 for the plaintiff's response.[3] On August 3, 2005, plaintiff filed a response to the defendants' motions.[4]

Although the defendants rely on both Fed. R. Civ. P. 12(b)(6) and 56, the Court finds it more appropriate to analyze the motions under Rule 56. The plaintiff has a pending motion for leave to file a supplemental complaint, and he has also filed an amended complaint.[5] Although the plaintiff does not explicitly argue that his amended and supplemental pleadings remedy any deficiencies in his original complaint, the plaintiff has submitted additional complaints that fall outside the scope of the defendants' Rule 12(b)(6) motion. More importantly, however, all parties have submitted substantial evidence outside the scope of the pleadings and, therefore, it is appropriate to analyze the motion under Rule 56. See Fed. R. Civ. P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not

---

[3]     Although the motion does not specifically say so, plaintiff is presumably seeking an extension of time to reply to the May 2, 2005 supplemental motion, which was further supplemented with additional case citations on June 3, 2005. The plaintiff's response to the May 2, 2005 motion was due on June 1, 2005. Ordinarily, a motion for an extension of time should be filed on or before the due date for the response.

[4]     On August 2, 2005, plaintiff filed a motion, entitled "Motion to Consolidate Filings," in which he sought to have his June 14, 2005 and August 3, 2005 responses consolidated. In this motion, the plaintiff stated that "his health and the severe pain he is suffering has prevented him from being capable of completing the required Memorandum of Law to his response, and that the earlier objections should serve as the Memorandum of Law thereof." It is not clear precisely what the plaintiff is seeking. To the extent plaintiff wants both of his responses to be considered in opposition to all aspects of the defendants' motions, his motion is GRANTED.

[5]     The amended complaint is subject to review pursuant to 28 U.S.C. § 1915A and, therefore, the status of the amended complaint will be addressed in a separate order.

4

excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.").

Summary judgment is appropriate "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court explained:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (citation omitted).

Under Fed. R. Civ. P. 56(e), "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." In considering a motion for summary judgment, "the evidence as well as the inferences drawn therefrom must be read in the light most

5

favorable to the party opposing the motion." <u>Kochins v. Linden-Alimak, Inc.</u>, 799 F.2d 1128, 1133 (6th Cir. 1986); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986) (same).[6]

A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>id.</u> at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]"); <u>Matsushita</u>, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (footnote omitted). The Court's function is not to weigh the evidence, judge credibility, or in any way determine the truth of the matter, however. <u>Liberty Lobby</u>, 477 U.S. at 249. Rather, the inquiry is "whether the evidence presents a sufficient disagreement to

---

[6] Rule 56(e) sets forth in detail the evidentiary requirements applicable to a summary judgment motion:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify as to all the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

Moreover, Fed. R. Civ. P. 56(f) provides as follows:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

"Beyond the procedural requirement of filing an affidavit, Rule 56(f) has been interpreted as requiring that a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." Cacevic v. City of Hazel Park, 226 F.3d 483, 488 (6th Cir. 2000); see also Good v. Ohio Edison Co., 149 F.3d 413, 422 (6th Cir. 1998); Plott v. General Motors Corp., 71 F.3d 1190, 1196-97 (6th Cir. 1995). Moreover, the Sixth Circuit has held that, unless the nonmoving party files a Rule 56(f) affidavit, a district court cannot decline to consider the merits of a summary judgment motion on the ground that it is premature. Wallin v. Norman, 317 F.3d 558, 564 (6th Cir. 2003).

For purposes of this motion, the following facts are undisputed:[7]

---

[7]    Local Rule 7.2(d)(3) provides that "the opponent of a motion for summary judgment who disputes any of the material facts upon which the proponent has relied pursuant to subsection (2) above shall respond to the proponent's numbered designations, using the corresponding serial numbering, both in the response and by affixing to the response copies of the precise portions of the record relied upon to evidence the opponent's contention that the proponent's
(continued...)

1.    Plaintiff is a federal inmate who has been incarcerated at FCI-Memphis since November 16, 1998. (Declaration of Clarrisa M. Greene, dated Feb. 10, 2005 ("Greene Decl."), at Att. A.)[8]

2.    He is serving a sentence of one hundred fifty-five (155) months for attempt to manufacture methcathinone in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846. (Greene Decl. at Att. B.) Plaintiff is projected for release on May 9, 2007, based on the good conduct time release method. (Id. at Att. A.)[9]

3.    On November 16, 1998, plaintiff completed a medical history report at FCI-Memphis. (Declaration of Nahem A. Naimey, M.D., dated Feb. 10, 2005 ("Naimey Decl."), at ¶ 4 & Att. A.)[10] On that report, plaintiff indicated that he had experienced frequent or painful urination and had a history of kidney stones or blood in his urine. (Id.) Plaintiff also indicated that he had undergone "urethra dilation" before his incarceration. (Id.) During plaintiff's November 16, 1998 intake screening, the physician's assistant conducting the screening referred plaintiff to FCI-Memphis' Chronic Care

_____

[7]    (...continued)
designated material facts are at issue." The plaintiff's original response, which was submitted on June 14, 2005, did not specifically respond to each of the statements set forth at pp. 2-6 of the defendants' memorandum under the caption, "Statement of Facts." Instead, that response listed a series of statements in the defendants' memorandum with which the plaintiff disagrees, including both factual statements and legal arguments. More importantly, plaintiff has not cited to, or attached, portions of the record that demonstrate the existence of disputed factual issues.  In his August 3, 2005 response, the plaintiff did respond to each of the proposed factual statements submitted by the defendants, although, once again, he did not specifically identify portions of the record in support of his positions. Nonetheless, the Court has attempted, by examining the text of the plaintiff's responses and the documents submitted with the complaint, to discern the extent to which plaintiff is able to dispute the proposed factual findings submitted by defendants.

[8]    The Greene Declaration is Exhibit 1 to Defendants' Motion to Dismiss Combined with Supporting Memorandum of Law, filed Feb. 14, 2005 ("D. 02/14/05 Br.").

[9]    Although plaintiff states that these facts are not material, he apparently does not dispute them.

[10]    See D. 02/14/05 Br., Ex. 2.

8

Clinic ("CCC") based on a history of hyperlipidemia or high cholesterol. (Id., ¶ 4 & Att. B.)[11]

4. After his initial screening, plaintiff reported to Health Services at FCI-Memphis regularly and received medical care. (Id., ¶ 5 & Att. B.)[12]

5. Plaintiff first reported to Health Services with complaints of discomfort during urination on December 14, 1998. (Id., ¶ 5.) He informed the physician's assistant that he had a history of urethral stricture and had last had corrective surgery in 1987. (Id.) The physician's assistant prescribed plaintiff Bactrin, instructed him to increase his fluid intake, and referred plaintiff to a urologist. (Id.)

6. On February 19, 1999, plaintiff had his first consultation with Dr. Shappley. (Id., ¶ 6.) In addition to numerous visits to Health Services for treatment of kidney stones, recurrent urethral strictures and related conditions, plaintiff has been regularly referred to and treated by Dr. Shappley. (Id., Atts. B & C.)[13]

---

[11]    In his August 3, 2005 response, the plaintiff disputed that, in his intake questionnaire, he stated that he had a ten-year history of passing kidney stones. As the document does not specifically state that plaintiff had a ten-year history of passing kidney stones, that proposed factual statement has been omitted. (It appears, however, that plaintiff later told a physician's assistant at FCI-Memphis that he had a ten-year history of passing kidney stones. See infra ¶ 5.)

        The plaintiff also stated, cryptically, that, among the factual issues to be resolved is "[w]hether the notation made by the physicians' [sic] assistant was made as a result of plaintiff's submissions or his own assumptions." Plaintiff's Response to Defendant's [sic] Motion for Dismissal or for Summary Judgment with Combined Memorandum of Law, filed Aug. 3, 2003 ("P. 08/03/05 Br."), at 5. It is not clear what plaintiff means by this statement. The medical history form submitted by the defendants bears his signature. To the extent he contends there is a disputed issue of material fact, plaintiff has the responsibility of specifically identifying it and putting forward evidence in support of his position.

[12]    Although defendants' proposed factual statement provided that plaintiff "received prompt and appropriate medical care," the plaintiff has disputed that statement. In light of the Court's previous ruling that "all claims accruing prior to February 4, 2003 . . . are time barred," 10/29/04 Order at 17, it is not necessary to review in detail the appropriateness of the medical treatment the plaintiff received throughout his confinement at FCI-Memphis.

[13]    The plaintiffs' response is not very clear. He apparently does not dispute that he first saw Dr. Shappley on February 19, 1999. He also does not appear to take issue with Attachment C, which indicates he had appointments with Dr. Shappley on or about February 19, 1999; April 7, 1999; May 21, 1999; October 15, 1999; January 12, 2000; March 30, 2000; April 29, 2000; September 29, 2000;
(continued...)

7.    On May 1, 2003, Dr. Shappley examined plaintiff, conducted a renal ultrasound, and found both of plaintiff's kidneys to be normal except for a renal calculus (kidney stone) in his right kidney. (Id., ¶ 7 & Att. E.) Dr. Shappley recommended the following treatment: (1) a cystoscopy; (2) an optical internal uretherotomy; and (3) a right stent insertion. (Id., Att. C.).[14]  On the consultation sheet, Dr. Shappley wrote "lithotripsy later." (Id.)[15]

8.    Dr. Shappley's recommendations for treatment of plaintiff's kidney stone were reviewed by medical staff at FCI-Memphis on May 10, 2003. (Id., ¶ 10.) Gary Glover of the FCI-Memphis medical staff instructed Dr. Shappley to

_____

[13]    (...continued)
another date prior to December 7, 2000; February 22, 2001; April 29, 2001; June 13, 2001; September 14, 2001; December 20, 2001; March 15, 2002; March 27, 2002; April 16, 2002; August 15, 2002; October 2, 2002; October 30, 2002; December 6, 2002; May 1, 2003; July 16, 2003; November 21, 2003; February 3, 2004; March 10, 2004; April 30, 2004; June 10, 2004; October 26, 2004; December 21, 2004; January 24, 2005; and February 1, 2005. Although the plaintiff lists proposed unresolved issues of material fact relevant to this proposed finding, most of his submission concerns the legal effect of the proposed fact and not the accuracy of the statement itself. Moreover, he does not submit evidence in support of his positions.

[14]    According to Dr. Naimey, "[a] cystoscopy is a procedure through which a cytoscope is inserted into the urethra or bladder. If a doctor sees a kidney stone they [sic] can remove the stone using a device placed on the end of the cytoscope. A uretherotomy is a procedure through which part of a patient's urethra is removed or cut into." Id., ¶ 9. A stent is a tube that is left in the kidney during the healing process.

[15]    Dr. Naimey explained that

[l]ithotripsy is a non-surgical technique for treating stones in the kidney and ureter using energy shock waves. These shock waves break stones into very small pieces which can then pass from the body along with the urine. After lithotripsy it may take about 90 days for the stone fragments to pass out of the body. Even though the stones are fragmented, the passing through the urinary tract may still cause discomfort. When choosing lithotripsy as a treatment method for kidney stones, physicians must consider the size, number, location, and composition of the stones. Even after lithotripsy has been performed, the patient may still have large stones that will be difficult to pass.

Id., ¶ 8.

Although the nature of the plaintiff's dispute is not clear, he seems to object to the fact that the defendants referred to lithotripsy as only a "possibility," rather than a definite recommendation. The Court has rewritten the last sentence of this factual finding in response to the plaintiff's objection. Plaintiff's other objections, including subsequent alleged interference by defendant Anderson, are not relevant to the defendants' proposed factual statement, which is limited to the content of Dr. Shappley's recommendation on May 1, 2003.

proceed with the cystoscopy, optical internal uretherotomy, and right stent insertion per his recommendation. (Id., ¶ 10 & Att. C.) That approval did not involve the Utilization Review Committee because that committee was not created until July of 2003. (Declaration of Joyce Anderson, dated Feb. 10, 2005, at ¶ 3, in D. 02/14/05 Br., Ex. 3.)[16]

9. On July 15, 2003, plaintiff underwent a cystoscopy, optical internal urethrotomy, urethral dilation, Foley catheter insertion, a bilateral ureteroscopy, and bilateral retrograde pylography with uroscopy. (Id., ¶ 11.) In the discharge summary, Dr. Shappley noted that plaintiff "underwent the procedures via the outpatient department at St. Francis Hospital without incident . . . and is being returned to [FCI-]Memphis on [medications]." (Id., Att. D.)[17]

10. Per Dr. Shappley's instructions, medical staff at FCI-Memphis removed plaintiff's Foley catheter on July 18, 2003. (Id., ¶ 11 & Att. B.)

11. Plaintiff continues to be seen by medical staff at FCI-Memphis regularly and was most recently examined by Dr. Shappley at the Shappley Clinic on February 1, 2005. (Id., ¶ 13 & Att. C.) During that visit, Dr. Shappley

---

[16]    The plaintiff does not seem to dispute the substance of this proposed factual finding, although he does contend that there was subsequent interference that prevented it from being implemented. That issue will be addressed infra. Notably, plaintiff has come forward with no evidence to counter Anderson's statement that the Utilization Review Committee was not formed until July of 2003.

[17]    The plaintiff does not seem to dispute the substance of this statement. Instead, he complains that a stent was not inserted. The plaintiff's medical records do not indicate why the procedures performed in ¶ 9 of the text were performed, rather than the stent insertion that was approved on May 1, 2003. Dr. Naimey's declaration states, without elaboration, that the procedures listed in the text were performed "pursuant to Dr. Shappley's May 1, 2003 recommendations." Naimey Decl., ¶ 11. Plaintiff has pointed to a copy of the response to his inmate grievance, which states that "[t]he operative report states that 'endoscopic evaluation of the ureters, as well as radiographic evaluation proved unsuccessful.' If this part of the renal evaluation could not have been completed, then a stent could not have been inserted." Compl., Ex. G12. A copy of the operative report is included at Exhibit C to the Naimey Declaration, but no party has explained the significance of that statement, which does not establish deliberate indifference. More importantly, the plaintiff has not explained, and documented, how the procedures performed by Dr. Shappley differed from those that were authorized on May 1, 2003.

prescribed plaintiff Cipro and Motrin and recommended follow up in three months. (Id.)[18]

12.   The Utilization Review Committee ("U.R.C.") at FCI-Memphis is a committee of medical personnel and institution administrators who meet weekly to discuss treatment options for patients. (Anderson Decl., ¶ 3.) Defendant Joyce Anderson, formed the committee in July of 2003. The U.R.C. is comprised of the Health Services Administrator, Clinical Director, Health Systems Specialist, Physician's Assistants, and the Associate Warden. (Id.)[19]

13.   From February 4, 2003 to August 9, 2004, the time period relevant to this complaint, defendant Aaron participated in only one U.R.C. meeting during which plaintiff's medical condition and treatment were discussed. (Anderson Decl., Ex. A.). That meeting took place on Wednesday, December 3, 2003, when the U.R.C. met to discuss Dr. Shappley's November 21, 2003 recommendation that plaintiff undergo a renal ultrasound and uroflow studies. (Id.) After that U.R.C. meeting, Dr. Naimey approved the recommendation and agreed to schedule the tests within two months. (Id.)[20]

---

[18]   The precise nature of the plaintiff's objection is, again, difficult to decipher because, instead of presenting evidence, he poses a series of questions. The plaintiff does not seem to dispute that he was regularly seen by the medical staff at FCI-Memphis and by Dr. Shappley or that Dr. Shappley prescribed the medication listed in the text of ¶ 11. He does provide excerpts from his medical records indicating that, on October 26, 2004, Dr. Shappley found a 2 cm. kidney stone and recommended a plan to treat it. Although the plaintiff asserts that this kidney stone may be the same as the 1 cm. kidney stone Dr. Shappley diagnosed on March 27, 2002, he has submitted no evidence to support that claim. (Moreover, it appears that, on November 10, 2004, the Utilization Review Committee approved the treatment recommended by Dr. Shappley on October 26, 2004, "with scheduling to be within 2 months." Anderson Decl., Ex. A.)

[19]   The plaintiff's various objections do not go to the substance of the proposed factual finding, with the possible exception of his objection to the statement that the committee was scheduled to meet weekly. Plaintiff has submitted no evidence that the committee did not, in fact, meet weekly. Anderson's Declaration states that "[t]he Committee meets every Wednesday, unless scheduling conflicts of the members dictates otherwise." Anderson Decl., ¶ 3.

[20]   In his response, plaintiff asserted, without any record citation, that "defendant Aaron advised plaintiff, on October 17, 2003, that he would personally discuss plaintiff's treatment with defendant Anderson at the next scheduled URC meeting." P. 08/03/05 Br. at 21. Plaintiff is presumably making the point that there was some delay before the U.R.C. considered the treatment recommended for the plaintiff. It is not clear from the documents submitted by the parties whether defendant Aaron missed scheduled meetings of the U.R.C. or whether he attended the
(continued...)

. . . .

16. At all relevant times, Joyce Anderson was a commissioned officer in the U.S. Public Health Service. (Anderson Decl., ¶ 1.)[21]

Defendants first contend that the complaint does not allege an Eighth Amendment violation. The Eighth Amendment prohibits cruel and unusual punishment. See generally Wilson v. Seiter, 501 U.S. 294 (1991). An Eighth Amendment claim consists of both objective and subjective components. Farmer v. Brennan, 511 U.S. 825, 834 (1994); Hudson v. McMillian, 503 U.S. 1, 8 (1992); Wilson, 501 U.S. at 298; Brooks v. Celeste, 39 F.3d 125, 127-28 (6th Cir. 1994); Hunt v. Reynolds, 974 F.2d 734, 735 (6th Cir. 1992). The objective component requires that the deprivation be "sufficiently serious." Farmer, 511 U.S. at 834; Hudson, 503 U.S. at 8; Wilson, 501 U.S. at 298. The subjective component requires that the official act with the requisite intent, that is, that he have a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834; Wilson, 501 U.S. at 297, 302-03.

---

[20]     (...continued)
meetings but did not mention the plaintiff. The statement in the text referred to a November 21, 2003 recommendation by Dr. Shappley, so it seems unlikely that defendant Aaron's alleged statement on October 17, 2003 refers to the November 21, 2003 recommendation. Moreover, a review of plaintiff's medical records indicates that, on October 31, 2003, someone at FCI-Memphis authorized Dr. Shappley to "[p]lease proceed with follow-up on Rt. renal calculus and chronic dysuria." Naimey Decl., Ex. D.

[21]     The Court has omitted the proposed factual findings that are not adequately supported and that have been contested by the plaintiff.

The plaintiff's objection that defendant Anderson was acting outside the scope of her employment will be addressed infra.

The Eighth Amendment proscription of cruel and unusual punishment prohibits prison authorities from displaying deliberate indifference to the serious medical needs of prisoners, because such indifference constitutes the "unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104 (1976). "A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980) (quoting Laaman v. Helgemoe, 437 F. Supp. 269, 311 (D.N.H. 1977)).

To establish liability under the Eighth Amendment for a claim based on failure to prevent harm to a prisoner, a plaintiff must show that the prison officials acted with "deliberate indifference" to a substantial risk that the prisoner would suffer serious harm. Farmer, 511 U.S. at 834; Helling v. McKinney, 509 U.S. 25, 32 (1993); Woods v. Lecureux, 110 F.3d 1215, 1222 (6th Cir. 1997); Street v. Corrections Corp. of Am., 102 F.3d 810, 814 (6th Cir. 1996); Taylor v. Michigan Dep't of Corrections, 69 F.3d 76, 79 (6th Cir. 1995). "[D]eliberate indifference describes a state of mind more blameworthy than negligence." Farmer, 511 U.S. at 835. Thus,

> [a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Eighth Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and

14

> unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. . . . But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Id. at 837-38 (emphasis added; citations omitted). Thus, medical malpractice does not become a constitutional violation merely because the victim is a prisoner. Estelle, 429 U.S. at 105-06 ; see also Sanderfer v. Nichols, 62 F.3d 151, 154 (6th Cir. 1995) ("Deliberate indifference . . . does not include negligence in diagnosing a medical condition.").

In this case, there is no dispute that the plaintiff suffers from kidney stones, which is a serious medical condition. D. 02/14/05 Br. at 12. Defendants argue, however that

> plaintiff's medical record clearly demonstrates that he has received and continues to receive treatment for kidney stones. . . . And most important, he has received every treatment recommended by Dr. Shappley, at the time Dr. Shappley prescribed it. The plaintiff's allegation to the contrary—his allegation that he did not get all the procedures Dr. Shappley recommended on May 1, 2003—is manifestly wrong. On May 1, 2003, Dr. Shappley recommended that plaintiff undergo a cystoscopy, optical internal uretherotomy, and a right stent insertion. . . . There was no recommendation that plaintiff receive lithotripsy at that time; instead, Dr. Shappley recommended that plaintiff receive "lithotripsy later," without specifying when. . . . FCI Memphis medical staff approved Dr. Shappley's recommendations on May 1, 2003, the same day he made them. . . . On July 15, 2003, Dr. Shappley performed cystoscopy, optical internal urethrotomy, urethral dilation, Foley catheter insertion, a bilateral ureteroscopy, and bilateral retrograde pyelography with uroscopy. . . . Although Dr. Shappley had approval to perform all the procedures he recommended on May 1, 2003, he elected not to perform the

stent insertion. That was Dr. Shappley's decision, not the
decision of the defendants' [sic] who had approved the
stent insertion.

D. Br. at 12-13. The evidence submitted by defendants does not
clearly support these arguments. It appears that Dr. Shappley
received prompt approval from FCI-Memphis to perform the procedures
he recommended on May 1, 2003. FF 8. On July 15, 2003, Dr. Shappley
performed some, but not all, the procedures he recommended on May 1,
2003. FF 9. The defendants' submissions provide no coherent
explanation for the fact that Dr. Shappley did not perform a right
stent insertion.[22] Defendants also contend that Dr. Shappley
recommended "lithotripsy later," which is precisely what the
plaintiff received.[23]

In response, the plaintiff first asserts that defendant
Anderson rescinded the approval that was previously given for the
stent insertion. In support of this statement, the plaintiff has
submitted his own factual affidavit, which purports to recount a

---

[22]    The statement in Dr. Naimey's declaration that the July 15, 2003
procedures were performed "pursuant to Dr. Shappley's May 1, 2003 recommendation,"
Naimey Decl., ¶ 11, is too vague to constitute an explanation.

[23]    According to Dr. Naimey:

Pursuant to Dr. Shappley's recommendation, inmate Gregory
received lithotripsy in March of 2004. Dr. Shappley examined inmate
Gregory on November 21, 2003, and recommended a renal ultrasound and
UF study. I approved this recommendation and inmate Gregory received
the ultrasound and UF study on February 3, 2004, at the Shappley
Clinic. The tests revealed inmate Gregory had severe distal urethral
stricture and a kidney stone in his right kidney. As a result of the
diagnostic tests, Dr. Shappley recommended inmate Gregory undergo a
cystoscopy, optical internal urethrotomy, a stent insertion and a
lithotripsy following the other procedures. I approved Dr. Shappley's
recommended procedures on February 3, 2004, and inmate Gregory received
a cystoscopy, stent insertion and lithotripsy on March 10, 2004.

Naimey Decl., ¶ 12.

16

conversation with Dr. Shappley on November 21, 2003, in which Dr. Shappley told him that he did not perform the stent insertion on July 15, 2003 because defendant Anderson refused to authorize payment. Affidavit of Rory Allen Gregory Relating to Conversation with Dr. Shappley, sworn to on July 27, 2004, at ¶¶ 1-7; see also P. 06/14/05 Br. at 7-8 ("Dr. Shappley informed Plaintiff that Defendant Anderson had prevented him [Dr. Shappley] from inserting the JJ Stent on July 15, 2003, because she refused to authorize payment") (alteration in original; emphasis omitted). Plaintiff has not submitted an affidavit from Dr. Shappley, however, and the hearsay statements attributed to him by the plaintiff cannot be used to defeat a summary judgment motion. See supra p. 6 n.6; see also Cox v. Kentucky Dep't of Transp., 53 F.3d 146, 149 (6th Cir. 1995) ("Essentially, a motion for summary judgment is a means by which to 'challenge the opposing party to "put up or shut up" on a critical issue.'").[24] Accordingly, plaintiff has not come forward with sufficient evidence to raise a triable issue of fact about the failure to perform a stent insertion on July 15, 2003.

The next issue is whether plaintiff has raised a triable issue of fact about the alleged delay in performing the lithotripsy. As previously noted, Dr. Shappley's May 1, 2003 treatment recommendation stated "lithotripsy later." FF 7. Defendants note that plaintiff received "lithotripsy later," on March 10, 2004. D.

---

[24]    Plaintiff also has not filed a Rule 56(f) affidavit seeking an extension of time to obtain an affidavit from Dr. Shappley.

02/14/05 Br. at 4 n.2; see Naimey Decl., ¶ 12. According to defendants,

> Dr. Shappley examined plaintiff on November 21, 2003 and recommended a renal ultrasound and UF study. . . . Plaintiff received the ultrasound and UF study on February 3, 2004, at the Shappley Clinic. . . . The tests revealed that plaintiff had severe distal urethral stricture and a kidney stone in his right kidney. . . . On February 3, 2004, Dr. Shappley recommended that plaintiff undergo a cystoscopy, optical internal urethrotomy, a stent insertion and lithotripsy following the other procedures. . . . Dr. Naimey approved Dr. Shappley's recommended procedures, and plaintiff received a cystoscopy, stent insertion and lithotripsy on March 10, 2004.

D. 02/14/05 Br. at 4 n.2 (record citations omitted).

In response, the plaintiff asserts that the new round of tests could have been due to defendants' interference with the implementation of Dr. Shappley's recommendation on May 1, 2003 that plaintiff receive the lithotripsy. P. 08/03/05 Br. at 13. Plaintiff submitted an affidavit recounting a purported conversation with Dr. Shappley on November 21, 2003, in which the doctor allegedly stated that "the HSA, Ms. Joyce Anderson, had refuse[d] to allow him to perform the Lithotripsy by refusing to authorize payment for the procedure." Affidavit of Rory Allen Gregory Relating to Consultation with Dr. Shappley, sworn to on July 27, 2004, at ¶ 9. In that affidavit, plaintiff also contends that Dr. Shappley denied that he had intended that the lithotripsy be performed later but, rather, "that he had specifically directed that I undergo a Cystoscopy, JJ Stent insertion and Lithotripsy." Id., ¶ 13. That affidavit further states that, according to Dr. Shappley, another round of tests was necessary because of the delay in scheduling the lithotripsy. Id., ¶

16. However, as previously stated, see supra pp. 16-17, the hearsay statements attributed to Dr. Shappley cannot be used to defeat a summary judgment motion.

Plaintiff further points to conversations he contends he had with defendant Aaron about the scheduling of his lithotripsy in which Aaron allegedly admitted that he believed plaintiff's name was on the list to receive lithotripsy but that it had somehow been removed. Compl., ¶¶ 89-96;[25] see also Affidavit of Rory Allen Gregory Relating to Conversation with A.W. Gary Aaron, sworn to on July 27, 2004.[26] It is not clear whether or not Aaron admits that he made these statements. See Declaration of Gary Aaron, dated Feb. 10, 2005 ("Aaron Decl."), at ¶ 4 ("I recall informing [Gregory] that he was on the list for such treatment but that he could not be given an exact date for the medical trip due to security concerns."), at D. 02/14/05 Br., Ex. 4. Even if Aaron denied making the statements, plaintiff's sworn statements would be sufficient to create a triable issue of fact about whether the statements were made.

Dr. Shappley's May 1, 2003 treatment recommendation, however, containing the words "lithotripsy later," and defendant Aaron's purported admissions are not sufficient to raise a triable issue of fact about whether the delay in scheduling lithotripsy violated the Eighth Amendment. The words "lithotripsy later" are

---

[25] Plaintiff's verified complaint is the functional equivalent of an affidavit. Smith v. Campbell, 250 F.3d 1032, 1036 (6th Cir. 2001); Weberg v. Franks, 229 F.3d 514, 526 n.14 (6th Cir. 2000).

[26] Because Aaron is a party to this action, his alleged statements are not hearsay. Fed. R. Evid. 801(d)(2).

inherently ambiguous. No admissible evidence supports the plaintiff's contention that Dr. Shappley intended that a lithotripsy be scheduled for the weeks after the July 15, 2003 procedures, and no admissible evidence contradicts the defendants' interpretation of the words as referring to the possibility of lithotripsy at some later time. The plaintiff also has not introduced evidence that the need for lithotripsy would have been obvious after the July 15, 2003 procedures. Although the plaintiff has indicated that he continued to suffer pain and difficulty in urination, those facts, standing alone, are insufficient to permit the Court to conclude that the specific treatment that was needed was lithotripsy.[27] Finally, the purported statements by defendant Aaron, standing alone, are insufficient to permit a jury to conclude that there was intentional interference with Dr. Shappley's treatment plan, rather than, at most, negligence or a miscommunication.

Finally, that the plaintiff continued to suffer from kidney stones for a lengthy period of time is not, in itself, evidence of deliberate indifference. That the plaintiff has had recurrent kidney stones may mean nothing more than that people who suffer from kidney stones tend to suffer from repeated episodes of that condition. Plaintiff has introduced no admissible evidence documenting the medically accepted procedure for treating his medical condition, nor

---

[27] That conclusion is reinforced by the fact that, after two lithotripsies, the plaintiff was still complaining of similar symptoms in the third quarter of 2004. See Anderson Decl., Ex. A. A third lithotripsy was approved on November 10, 2004. Id.

has he demonstrated, through expert testimony, that the treatment provided for his condition was so deficient as to constitute deliberate indifference to his serious medical need. It is undisputed that the plaintiff made multiple visits to the medical staff at FCI-Memphis and that he was repeatedly referred to a specialist for tests and treatment. The record does not establish any recommendation of Dr. Shappley that was not implemented, although there were often delays of several months between the requests for tests and the scheduling of the corrective procedures. Finally, the plaintiff has not come forward with admissible evidence that the delays, in themselves, were so severe as to result in further medical complications or that that result would have been obvious to the defendants.

Accordingly, the Court GRANTS summary judgment for the defendants on the Eighth Amendment claim. As the plaintiff cannot establish a constitutional violation, each of the defendants is entitled to qualified immunity. Scicluna v. Wells, 186 F.3d 685, 691 (6th Cir. 1999) (en banc).[28]

---

[28]     According to the Sixth Circuit:

The doctrine of qualified immunity shields from liability for civil damages those officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . . (1982). We evaluate a defendant's claim of qualified immunity by determining whether (1) a constitutional violation occurred, (2) the right violated was clearly established, and (3) "the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." Williams v. Mehra, 186 F.3d 685, 691 (6th Cir. 1999) (en banc).

(continued...)

Next, defendant Anderson contends that she has absolute immunity as a commissioned officer of the public health service. In her declaration, Anderson states as follows:

1.   I, Joyce Anderson, am a commissioned officer of the U.S. Public Health Service and have been assigned as the Health Services Administrator (HSA) at the Federal Correctional Institution, Memphis, Tennessee since June 2, 2003.

2.   As the Health Services Administrator, I am responsible for directly supervising clinical and clerical staff; responding to inmate grievances; managing the inside and outside medical budgets; overseeing all scopes of ambulatory healthcare services; and attending regular meetings to include the Utilization Review Committee. Additionally, I am responsible for implementing continuous quality improvement activities and providing daily communication regarding the Health Services department to the Executive Staff.

3.   I established FCI Memphis' Utilization Review Committee in July of 2003. The Committee meets every Wednesday, unless scheduling conflicts of the members dictates otherwise. The Committee is comprised of the HSA, Clinical Director, Health Systems Specialist and the Associate Warden of Operations.

4.   Attached hereto as <u>Attachment A</u> is a true and correct copy of the notes from the U.R.C. meetings from February 4, 2003 to the present during which the Committee discuss[ed] diagnostic testing or medical treatment recommended by Dr. Shappley of the Shappley Clinic [for] inmate Rory Allen Gregory, Federal Register number 36628-079. The notes provide the names of the persons in attendance at the meetings and a summary of the discussion regarding inmate Gregory.

Forty-two U.S.C. § 233(a) states:

The remedy against the United States provided by sections 1346(b) and 2672 of Title 28, or by alternative benefits provided by the United States where the availability of such benefits precludes a remedy under

---

[28]   (...continued)
<u>Id.</u>

section 1346(b) of Title 28, for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.[29]

Thus, where an individual defendant is a commissioned officer of the Public Health Service acting within the scope of her employment, the plaintiff's only remedy is pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq. In Cuoco v. Moritsugu, 222 F.3d 99, 109 (2d Cir. 2000), the Second Circuit held that a prison medical director was immune from a Bivens suit under § 233(a) because his "alleged misdeeds related only to his decision, as the principal medical official for the Bureau of Prisons, not to authorize a particular medical treatment for [the plaintiff]."[30]

In this case, there is no dispute that the plaintiff is a commissioned officer of the Public Health Service or that this action

---

[29] An action filed in state court may be removed "[u]pon a certification by the Attorney General that the defendant was acting in the scope of his employment at the time of the incident out of which the suit arose[.]" 42 U.S.C. § 233(c). Where, as here, the lawsuit originates in federal court, the statute does not require the Attorney General to certify that the defendant was acting within the scope of his employment. (By contrast, the Westfall Act, 28 U.S.C. § 2679, requires the Attorney General to certify that a federal employee defendant was acting within the scope of his employment with respect to any suit commenced in federal court. See 28 U.S.C. § 2679(d)(1). "The Attorney General's certification provides prima facie evidence that the employee was acting within the scope of employment." RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1142 (6th Cir. 1996). The Westfall Act is inapplicable here because the plaintiff's claims arise under the U.S. Constitution. Id., § 2679(b)(2)(A).)

[30] See also Tillitz v. Jones, No. Civ. 03-742-HA, 2004 WL 2110709 (D. Ore. Sept. 22, 2004) (dismissing Bivens claims against prison dentist); Seminario Navarrete v. Vanyur, 110 F. Supp. 2d 605 (N.D. Ohio 2000) (dismissing Bivens claims against prison doctors); Lewis v. Sauvey, 708 F. Supp. 167 (N.D. Ohio 1989) (dismissing Bivens action against prison medical officer).

arises out of "the performance of medical, surgical, dental, or related functions," within the meaning of the statute. Plaintiff suggests, however, that there are disputed issues of material fact about to whether Anderson was acting within the scope of her employment with respect to her conduct at issue in this lawsuit. P. 06/14/05 Br. at 28-33; P. 08/03/05 Br. at 23-24. The gravamen of the plaintiff's argument is that it is unlikely that Anderson was acting within the scope of her employment when she intentionally delayed the provision of necessary medical care to the plaintiff. Plaintiff's argument, however, is only another way of saying that he is bringing an Eighth Amendment claim against defendant Anderson. Such a claim requires that the defendant be deliberately indifferent to a serious medical need. If allegations like those made by this plaintiff were sufficient to deny immunity, 42 U.S.C. § 233(a) would not encompass _Bivens_ actions.[31] In this case, the materials submitted by the plaintiff provide no basis to conclude that defendant Anderson's actions were taken for anything other than professional reasons.[32]

---

[31]     See _Tillitz_, 2004 WL 2110709, at *4 ("Although plaintiff argues that defendant was not acting in his capacity as a government employee when he 'made cruel and taunting statements . . . [and] lied when he informed the Warden that a root canal had not been ordered at FCI Victorville,' . . . plaintiff attested in his complaint that defendant made the offending statements during a treatment consultation, and that defendant's false testimony was given during an administrative review made by Warden Daniels at FCI Sheridan. . . . Thus, defendant's activities occurred within the scope of his employment duties at FCI Sheridan.").

[32]     If the standards used to evaluate scope of employment under the Westfall Act are relevant here, summary judgment for defendant Anderson is appropriate. Under that statute, "[w]hether an employee was acting within the scope of his employment is a question of law, not fact, made in accordance with the law of the state where the conduct occurred." _RMI Titanium Co. v. Westinghouse Elec. Corp._, 78 F.3d 1125, 1142 (6th Cir. 1996). Under Tennessee law,

(continued...)

Accordingly, because it plainly appears that defendant Anderson was acting within the scope of her employment as an officer of the Public Health Service, the Court GRANTS the motion for summary judgment as to her.

Finally, defendant Aaron argues that the complaint must be dismissed as to him because he cannot be held liable on a theory of respondeat superior. There is no <u>respondeat superior</u> liability under 42 U.S.C. § 1983 or <u>Bivens</u>. <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691 (1978); <u>Bellamy v. Bradley</u>, 729 F.2d 416, 421 (6th Cir. 1984); <u>accord</u> <u>Okoro v. Scibana</u>, 63 Fed. Appx. 182, 184 (6th Cir. Apr. 1, 2003) (<u>Bivens</u>). Instead,

> [t]here must be a showing that the supervisor encouraged the specific instance of misconduct or in some other way directly participated in it. At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinates.

<u>Bellamy</u>, 729 F.2d at 421 (citation omitted).

In this case, plaintiff does not contend that defendant Aaron should be held liable solely because of his former position as Associate Warden. Instead, the plaintiff contends that defendant Aaron had a role in the approval of his medical treatment as a member

---

[32]   (...continued)
"for the acts of the servant, within the general scope of his employment, while engaged in his master's business, and done with a view to the furtherance of that business and the master's interest, the master will be responsible, whether the act be done negligently, wantonly, or even willfully. In general terms, if the servant misconducts himself, his acts are the acts of the master, who must answer for them."

<u>Anderson v. Covert</u>, 193 Tenn. 238, 241, 245 S.W.2d 770, 771-72 (1952) (citation omitted).

of the U.R.C. Apart from his attendance at one meeting in late 2003, at which the plaintiff's treatment was discussed, the plaintiff also contends that he repeatedly enlisted defendant Aaron's assistance, presumably as a member of the U.R.C., in scheduling the lithotripsy he believed he needed. See supra pp. 18-19. Although a close question, plaintiff has come forward with sufficient evidence of defendant Aaron's personal involvement to make it clear that he is not relying on a respondeat superior theory of liability.[33] Accordingly, that aspect of defendants' summary judgment motion is DENIED. As the Court has already concluded that the defendants are entitled to summary judgment on the existence of an Eighth Amendment violation, this holding does not alter the fact that the Eighth Amendment claim against defendant Aaron has been DISMISSED.

That the Court has granted summary judgment on the claims asserted in the original complaint does dispose of this case. As previously stated, see supra p. 4 & n.5, plaintiff has filed an amended complaint that includes a claim under the FTCA.[34] Accordingly,

---

[33]    Although defendant Aaron states that he did not personally participate in making medical decisions, Aaron Decl., ¶ 5, he did sit on the U.R.C., which was entrusted with the responsibility for approving medical treatment recommendations.

[34]    That complaint has not yet been reviewed.

as there has been no final judgment, the Court cannot certify that an appeal would be taken in good faith.

IT IS SO ORDERED this _____30th_____ day of September, 2005.

_____

SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 73 in case 2:04-CV-02628 was distributed by fax, mail, or direct printing on September 30, 2005 to the parties listed.

---

William W. Siler
U.S. ATTORNEY'S OFFICE
167 N. Main St.
Ste. 800
Memphis, TN 38103

Rory Allen Gregory
FCI-MEMPHIS
36628-079
P.O. Box 34550
Memphis, TN 38184--055

Honorable Samuel Mays
US DISTRICT COURT